**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VAUGHN ANDERSON,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 26-CV-1228** |
| | : | |
| **CAPT. PRIFTI, *et al.*,** | : | |
| **Defendants.** | : | |

**MEMORANDUM**

**HENRY, J.** **AUGUST 18, 2026**

*Pro se* Plaintiff Vaughn Anderson commenced this civil action pursuant to 42 U.S.C. § 1983 by filing a Complaint naming numerous individual Defendants and asserting claims related to his pretrial detention within the city of Philadelphia Department of Prisons. In a prior Memorandum and Order, the Court granted Anderson leave to proceed *in forma pauperis* and partially dismissed his original Complaint on statutory screening, pursuant to 28 U.S.C. § 1915, with leave to amend the dismissed claims. *See Anderson v. Prifti*, No. 26-1228, 2026 WL 1079849 (E.D. Pa. Apr. 20, 2026). Currently before the Court are Anderson's Amended Complaint (ECF No. 12) and Motion to Appoint Counsel (ECF No. 13). For the following reasons, the Court will dismiss the Amended Complaint in part, allow other claims to proceed to service, and deny the Motion to Appoint Counsel without prejudice to renewal.

## I. FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY[1]

In dismissing Anderson's original Complaint, the Court explained that some of his claims were sufficiently pleaded to proceed to service, but others were not supported with enough facts.

---

[1] The facts set forth in this Memorandum are taken from Anderson's Amended Complaint (ECF No. 12 ("Am. Compl.")). The Court adopts the pagination assigned to the Complaint by the

*See generally Anderson*, 2026 WL 1079849, at *4-12. The original Complaint named sixteen individual Defendants and asserted seventeen discrete claims. (*See* ECF No. 1 at 2-3, 7-8.) The Amended Complaint names seventy-four individual Defendants, some as John or Jane Does, and asserts thirty-six discrete claims. (*See* Am. Compl. at 8-15, 34-41.)

### A. Excessive Force Incidents and Medical Diet

Anderson alleges that at Riverside Correctional Facility ("Riverside") on March 8, 2025, he had a dispute with a nurse about his medication, and afterwards, C.O. Bolden directed insults at him, then walked up to a tier above him, continued insulting him, "made threatening gestures with pepper spray and threatening to spray [Anderson] and call somebody to harm [him]," then "reared back" and spit on him "multiple times." (*Id.* at 16.) Bolden then called an emergency response and claimed that Anderson had spit on her. (*Id.*) Sergeant Foster Jr., C.O. Mendez, and C.O. John Doe 1 responded to Bolden's call, handcuffed Anderson, and escorted him towards the medical department and the restricted housing unit ("RHU"). (*Id.*) As they entered the medical area, Foster punched Anderson in the face repeatedly, caused his head to collide with the door frame, and pushed him to the floor, resulting in a head wound and an injury to Anderson's tailbone. (*Id.*) Mendez and Doe 1 did not intervene to stop Foster. (*Id.*)

Anderson was treated by a nurse for the head wound while C.O. Jones and C.O. Sellers asked him what happened; Foster, "standing nearby," denied the assault. (*Id.* at 17.) After Jones took pictures, Anderson was sent to two different hospitals, "one to staple his head shut and one to wire his mouth shut." (*Id.*) A misconduct report was prepared by Collins and Rose Jr., then

---

CM/ECF docketing system. Grammar, spelling, and punctuation errors are cleaned up where necessary. Additionally, the Court includes facts reflected in publicly available state court records, of which this Court may take judicial notice. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

Anderson was found not guilty of misconduct at a disciplinary hearing, based on video evidence of the incidents with Bolden and Foster. (*Id.*)

From March 15 to April 2, 2025, Anderson was housed in the infirmary on the Prison Health Services Wing ("PHSW"), where he "was not allowed more that [one] hour [of] recreation and was not allowed to attend [the] law library." (*Id.*) Lieutenants Thomas and Cook "explained this as policy and C.O. Smith enforced said policy." (*Id.*) Smith told Anderson that she had heard about his misconduct proceedings from Collins, who is her sister, and that Smith "kept [him] locked in unlike other inmates in [the] infirmary," that she was "reluctant to provide hygiene and clean clothing," and that she threatened to have him "transferred out early from [the] hospital despite [his] medical needs." (*Id.*)

Anderson returned to Riverside on April 2, 2025, and was placed in protective custody, where Foster harassed and threatened him and boasted to staff and other inmates about having broken Anderson's jaw. (*Id.*) Anderson alleges that he requested wax for the screws in his mouth and a medicated mouthwash that had been prescribed to prevent infection, but he received neither. (*Id.* at 18-19.) Anderson also started having problems with the special soft food diet that had been prescribed for him. (*Id.* at 17, 23.) He asserts that C.O. Jones was the kitchen officer in charge of special diets and regularly failed to provide Anderson's soft food diet. (*Id.* at 18.) When Anderson asked for assistance in getting his diet from Jones, "no successful measures were taken" by C.O. Polliver, Rogers, or Johnson. (*Id.*) Anderson alleges that "many times staff allowed inmates to steal diets before block workers handed them out," and other times items in his special diet arrived smashed or leaking. (*Id.*) He asked C.O. Allen for help, but she told him that "there was not much missing," and that the kitchen "provides what they choose to provide and rarely replaces what's missing." (*Id.*)

Anderson alleges that medical staff, specifically Nurse Brown, began ignoring his sick call requests. (*Id.* at 19.) He wrote to the medical department multiple times about what he believed was "a bone protruding from his gums[,] swelling in [his] mouth and face[,] and strange wounds appearing on [his] skin." (*Id.*) He reported his "diet and sick call issues" to Lieutenant Conn, who "was not able to do anything specific to help." (*Id.*) He then reported his problems with his medical needs and with Foster's "continuing threats and harassment" to a "federal monitor" who "did a tour" of the unit where Anderson was housed. (*Id.*)

Eventually, Anderson was seen by Nurse Gonzalez, who told him that she thought the "bone" was just a sore tooth. (*Id.*) When Anderson asked for a second opinion, he was seen by Dr. John Doe, who believed "the color and texture is consistent with a bone," stated he would prescribe antibiotics and pain medication, and referred Anderson to the dental department. (*Id.*) Anderson asserts that he did not receive any medication for a week, then went to see the dentist, and was immediately taken to the hospital. (*Id.*) He received emergency surgery to remove an abscess, flush his system with antibiotics, and insert a new plate into his neck. (*Id.*)

After being sent back to Riverside and placed in protective custody, on July 24, 2025, "C.O. Goode pepper sprayed [Anderson] after [a] short dispute and without warning." (*Id.* at 20.) Anderson states that he was seated "near [the] medication area waiting to request pain medication, when Goode ordered him to return to his cell, leading to the "brief dispute," then "suddenly pepper spray[ed]" him. (*Id.*) Anderson asserts that C.O. Rosa witnessed the incident and that "there was never any . . . need to assault or restrain [him]." (*Id.*) Goode claimed that Anderson had "threatened to spit on her," which Anderson alleges indicates that the incident was "obvious retaliation for [the] previous issue with C.O. Bolden," because Goode and Bolden were the only officers who had ever accused him of spitting or threatening to spit on them. (*Id.*)

Anderson had ongoing problems receiving his medical diet over a period of months, both at Riverside and at Curran-Fromhold Correctional Facility ("CFCF"). (*See generally id.* at 20-31.) In August 2025, his "medical diet was changed without instruction from [his] doctor," and he asserts that he complained to corrections staff who "followed up" with kitchen staff members Littlejohn and Teesa, and he "wrote sick call about health issues to no avail," but never received "physical proof or documentation to explain [the] change in [his] medical diet." (*Id.* at 21.) He was escorted to the medical department by Sgt. Rivera-Robinson, "but medical staff also refused to provide documentation to prove diet." (*Id.*) When Anderson asked for "medical staff more capable of resolving [the] issue[,] Sgt. Rivera-Robinson intervened[,] saying 'You're not getting any change or help with your diet, let it go, you wouldn't have these problems if you weren't in CFCF running your mouth and getting your jaw broke.'" (*Id.*) In September 2025, Anderson spoke to CO Brown about his diet, and Brown contacted kitchen staff member Hill, who reported that Anderson no longer was listed for a special diet. (*Id.* at 22.) Anderson spoke to Lt. Hill, who told him that he would not receive a special diet if the kitchen did not have instructions to provide one. (*Id.*)

In October 2025, Anderson went to sick call at CFCF on two occasions about his diet. (*Id.* at 23.) Anderson asserts that he was "prescribed *soft diet* by [the] outside hospital doctor," but the prison medical staff, specifically Dr. Sobers, placed him on a "soft *snack* diet." (*Id.* (emphasis added).) Anderson states that "the difference is known," but he makes only vague references to the nutritional inadequacy of a "snack" without describing the difference between "soft diet" and "soft snack diet." (*Id.* at 23, 27.) In December 2025, while he was in the RHU, Anderson again had difficulty receiving his diet, which he attributes to C.O. Jones. (*Id.* at 27.) He received responses to his grievances about the issue in early December, but he alleges that

Sgt. Kilson withheld a "written response" from medical staff that he claims would make it "easier to obtain written diet," but when he appealed Kilson's decision, Lt. McKenzie told him that he "was not supposed to receive the response." (*Id.* at 22.) Another response from Deputy Warden J.S. stated that Anderson was in fact receiving a "soft diet," but Anderson asserts that "the tag on [his] diet bag [said] *diet soft snack*." (*Id.* at 27 (emphasis added).) He states that sometime around December 29, 2025, "the label of the diet was changed and the wrong prescribed diet at least began to be fully provided." (*Id.* at 30.) Even after this change, "C.O. Brapham would leave [Anderson's] diet in [the] security booth," and his "shakes would be hot and spoil quickly." (*Id.*)

**B. Access to Law Library, Attorney, and Protective Custody**

Anderson also details numerous issues concerning his court proceedings, including access to the law library and his attorneys, as well as his requests for protective custody to avert threats based on his criminal charges. (*See generally id.* at 22-33.) Anderson avers that he was "sworn in *pro se*" in state court on April 1, 2025. (*Id.* at 20.) He also refers to having two "court appointed lawyers" as "standby counsel" for his criminal case. (*Id.* at 26.) Publicly available state court records indicate that Anderson was tried and convicted in December 2025, and sentenced in February 2026, on charges of unlawful sexual contact with a minor, corruption of minors, and indecent assault. *See Commonwealth v. Anderson*, No. CP-51-CR-0000016-2025 (C.P. Phila.) Anderson also states that he "was preparing [a] lawsuit and reaching out to law firms for representation" in September and October 2025. (Am. Compl. at 22.) The Court notes that Anderson commenced a separate civil action through counsel in state court in July 2025, concerning another, earlier assault on him in CFCF; that case was later removed by the

Defendants to this Court and remains pending. *See Anderson v. City of Philadelphia*, No. 26-0037 (E.D. Pa.).

Anderson first reports having his legal materials "misplaced by staff" while he was in PHSW in May and June 2025. (Am. Compl. at 20.) He asserts that during a sick call in October 2025, C.O. Pierce accessed his criminal charges, then shouted insults and threats at him, calling him "a rapist and a pedophile," and that someone was likely "gonna kill" him. (*Id.* at 23.) Anderson alleges that C.O. Pierce encouraged medical department staff "to deny him medical care." (*Id.*) Later, when he "refused to acknowledge C.O. Pierce['s] disrespect and authority," Sergeants Crawford and Butler "were called in an emergency response to de-escalate issue with no further incident." (*Id.* at 24.) Anderson also alleges that C.O. Allen-Wint disliked and antagonized him, and that she was involved in a plot to poison him. (*Id.* at 23-24.) At some point in November 2025, Anderson "had a blackout and injured his neck," and Allen-Wint "refused to call [for a] stretcher," but emergency staff responded and Sgt. Leca and C.O. Howard escorted him to medical, where he was treated with a neck brace and muscle relaxer. (*Id.* at 24.) Anderson told Leca, Howard, Lieutenant Flippen, and Lieutenant Radtke that, based on a recent spate of inmate emergencies and what he perceived as threats to his safety by his cellmate, Allen-Wint, and other inmates because of his status as a charged sex offender, he wanted to return to protective custody, but he was denied. (*Id.* at 24-25.) Howard told other inmates that Anderson was a "snitch," and made sexual threats to Anderson on two occasions, both of which Anderson reported to the PREA hotline. (*Id.* at 25-26.)

On November 21, 2025, inmate Devin Torres approached Anderson, called him a "snitch" and a "rat," threatened to beat him up, and snatched a tablet from him. (*Id.* at 26.) A fight ensued and Torres "fell down," then Anderson was handcuffed "without further incident"

and taken to the RHU. (*Id.*) Anderson asserts that even though his criminal trial was scheduled to begin in two weeks and he was proceeding *pro se* with his two appointed attorneys as standby counsel, Sgt. McManus and C.O. Coley confiscated all his legal documents when he was placed in the RHU. (*Id.*) He could not contact standby counsel because those appointed attorneys were not public defenders and "the law library phone only allowed call to the [Philadelphia] Defenders Association while [on] punitive status." (*Id.*) Counselor DeSoto asserted that his attorneys' phone numbers were not "in [the] computer which []had [been] confiscated with [Anderson's] property." (*Id.*) Anderson told Sgt. Kilson that he needed the "legal work in property [because of his] upcoming trial," but Kilson responded that he would get his property back when he was released from the RHU. (*Id.*) Anderson had a hearing conducted by Captain Prifti on December 1, 2025, where he testified about his issues leading up to the fight with Torres and presented grievance responses concerning his requests for protective custody, but he was found guilty of misconduct and sentenced to ten days in the RHU. (*Id.*)

Anderson asserts that he was scheduled to be released from the RHU on December 5, 2025, but instead he was held for two more days and then denied protective custody again once he was released. (*Id.* at 28.) He states that he "showed both Sgt. Abrahms and Lt. Bishop documentation proving" his scheduled release date and told them both about his upcoming trial and need for his legal materials, but they did not release him from the RHU until "on or about" December 8, 2025. (*Id.*)

Anderson's criminal trial took place from December 8-11, 2025. *See Anderson*, No. CP-51-CR-000016-2025. He alleges that his "phone account was not turned back on for [the] entire trial." (Am. Compl. at 28.) He asserts that he was "ultimately . . . denied [his] right to proceed *pro se*," and that he was "found guilty after a hung jury was forced to continue deliberating by

[the] judge after disagreeing [for two] days straight." (*Id.*) He states that he "lost [his] trial because of efforts to prevent him from preparing [his] defense." (*Id.*)

**C. Events Following Criminal Trial**

Two days after his trial, on December 13, Anderson got in a fight with his cellmate Luis Martinez "because of sex offense charges." (*Id.* at 28-29.) When C.O. Austin and Sgt. John Doe placed Anderson in the RHU, he complained that he was only given an uncovered sponge mattress, so they gave him trash bags to sleep on. (*Id.* at 28.) Austin took Martinez's word over Anderson's regarding the fight. (*Id.* at 29.) Sgt. Isufi took Anderson to medical, where he asserts that he "received no medical attention," other than a nurse creating a report stating that Anderson sustained "no injury," but also noting a "left hand abrasion and left side jaw pain." (*Id.*) Eventually he got an x-ray for his face but not for his hands, and Dr. Sobers prescribed him pain medication. (*Id.* at 30.) Anderson alleges that while he was in the RHU, he "continued to receive [the] wrong diet and often no diet at all." (*Id.*) C.O. Hawkins, Watson, and Brapham "denied [Anderson his] medical diet on many occasion[s]," and Watson was "especially reluctant" to help when Anderson complained about his diet. (*Id.* at 30-31.)

Anderson had another misconduct hearing for the fight with Martinez on December 15, again overseen by Captain Prifti, and he was denied the opportunity to call a witness, then sentenced to thirty days in the RHU. (*Id.* at 29.) C.O. Harris gave him an appeal form, which he completed the same day, "but there was never a response." (*Id.*) He asserts that on this occasion, his legal materials were not confiscated when his property was searched in the RHU. (*Id.*) At the time, Anderson was preparing for his sentencing in his criminal trial and intended to seek "extraordinary relief" and "still had hopes of proving [his] innocence." (*Id.* at 29-30.) He was only allowed to attend the law library twice in the month that he was in the RHU, and on

multiple occasions C.O. Brapham specifically intervened to deny his scheduled law library time. (*Id.* at 30.) Anderson alleges that in February 2026, his legal mail was tampered with, and he did not receive "transcripts needed to prove perjury and challenge [his] sentencing." (*Id.* at 33.)

Anderson alleges various other deprivations during this period in the RHU, for example, that "C.O. Hawkins denied showers and recreation a few times." (*Id.* at 30.) Anderson also alleges that on December 23, 2025, his inmate account "was charged $50.00 for no clear reason, without any process or notice of the reason," and he never received a response to the grievance he wrote to Sgt. Delhomme about the charge. (*Id.* at 31.) He also asserts that an unidentified nurse treated him for a mouth ulcer, told him it would clear up in two weeks, and would not provide him with pain medication because he had two days remaining on his current prescription for pain medication. (*Id.*)

After his release from the RHU, Anderson went for a mental health screening where he reported hearing voices. (*Id.* at 32.) The John Doe mental health doctor told him that hearing voices was not normal, and that he would either have to consent to taking Risperdal or be involuntarily committed to the mental health unit within PHSW. (*Id.*) C.O. Austin and C.O. John Doe 3 were also present and told him to take the medication or he would be taken to a "rubber room." (*Id.*) When Anderson resisted being taken to PHSW, the doctor called an emergency response unit that included Sgt. Leca and C.O. Washington. (*Id.*) Eventually, Anderson agreed to take the Risperdal, and he was returned to his cell block. (*Id.*) When he returned to the block, he had "a brief stare down" with C.O. Glenn, who then "scream[ed]" that Anderson was a rapist and threatened to "get [someone] to rape [him]." (*Id.*)

Anderson states that he suffers from many lingering medical issues stemming from the assault by Foster in March 2025 and the failure to properly treat his subsequent infection. (*Id.* at

33.) As noted above, he asserts thirty-six claims against seventy-four separate Defendants for, variously, excessive force, deliberate indifference to his medical needs, failure to intervene and protect him from violence by guards or inmates, denial of access to courts, and retaliation. (*Id.* at 34-40.) He seeks declaratory relief and unspecified money damages. (*Id.* at 43.)

## II. STANDARD OF REVIEW

Because the Court granted Anderson leave to proceed *in forma pauperis*, so 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Amended Complaint or any portion thereof that fails to state a claim. The Court applies the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), that is, whether a complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *Talley v. Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021). At the screening stage, the Court will accept the facts alleged in the *pro se* Complaint as true, draw all reasonable inferences in the Plaintiff's favor, and "ask only whether that complaint, liberally construed, contains facts sufficient to state a plausible claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197, 204 (3d Cir. 2024). Conclusory allegations do not suffice. *See Iqbal*, 556 U.S. at 678.

As Anderson is proceeding *pro se*, the Court construes the allegations in the Complaint liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)). The Court will "apply the relevant legal principle even when the complaint has failed to name it." *Id.* However, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Id.* (quoting *Mala*, 704 F. 3d at 245). An

unrepresented litigant "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants." *Id.*

## III. DISCUSSION

### A. Declaratory and Injunctive Relief

Anderson seeks a declaration that his rights were violated. (Am. Compl. at 43.) As explained in the Court's Memorandum dismissing the original Complaint, *see Anderson*, 2026 WL 1079849, at *4, declaratory relief is unavailable to adjudicate past conduct, *see Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*) ("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant simply to proclaim that one party is liable to another."); *see also Andela v. Admin. Office of U.S. Courts*, 569 F. App'x 80, 83 (3d Cir. 2014) (*per curiam*) ("Declaratory judgments are meant to define the legal rights and obligations of the parties in the anticipation of some future conduct."). A declaratory judgment is also not "meant simply to proclaim that one party is liable to another." *Corliss*, 200 F. App'x at 84 (*per curiam*); *see also Taggart v. Saltz*, No. 20-3574, 2021 WL 1191628, at *2 (3d Cir. Mar. 30, 2021) (*per curiam*) ("A declaratory judgment is available to define the legal rights of the parties, not to adjudicate past conduct where there is no threat of continuing harm."). Accordingly, Anderson's request for declaratory judgment is dismissed.

### B. Pleading and Joinder of Claims and Parties

The Court's prior Memorandum described Anderson's original Complaint "as a 'kitchen sink' or 'shotgun' complaint because it essentially seeks to bring 'every conceivable claim against every conceivable defendant.'" *Anderson*, 2026 WL 1079849, at *4-5 (citations omitted). The Court explained that Federal Rules of Civil Procedure 18 and 20 are "not a license to join unrelated claims and defendants in one lawsuit," and that courts "have frowned on

prisoners' attempts to lump together their multifarious grievances about life in a single prison." *Id.* at *5 (citations omitted). The Court warned Anderson that some of his claims could be severed if he joined unrelated claims against unrelated parties. *Id.* In response, he added another fifty-eight defendants and nineteen claims. For the reasons in this Memorandum, some of those claims will be dismissed, and Anderson will not be granted leave to amend. As to the remaining claims, the Court again notes that severance may become necessary, but in the interest of expedient service of process and responsive pleading, this action will proceed in its current form at this stage.

**C. Constitutional Claims**

Anderson asserts violations of his constitutional rights. The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

"A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Jutrowski v. Township of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) ("Each Government official, his or her title notwithstanding, is only liable for his or her *own* misconduct." (quoting *Iqbal*, 556 U.S. at 677) (emphasis in original)); *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*,

556 U.S. at 676. "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Chavarriaga v. N.J. Dept. of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Baker v. Monroe Township*, 50 F.3d 1186, 1194 (3d Cir. 1995); *Rode*, 845 F.2d at 1201 n.6).

**1. Excessive Force and Failure to Intervene**

Anderson alleges claims of excessive force against Defendants Bolden and Foster, Jr., related to the events of March 8, 2025, and alleges that Defendants Mendez and C.O. John Doe 1 failed to intervene to stop Foster's use of force. (*See* Am. Compl. at 34.) The Court's prior Memorandum explained that excessive force claims brought by pretrial detainees are analyzed under the Fourteenth Amendment, rather than the Eighth Amendment, applying an objective standard. *See Anderson*, 2026 WL 1079849, at *6-7 (citing, *inter alia*, *Kingsley v. Hendrickson*, 576 U.S. 389, 400-01 (2015); *Jacobs v. Cumberland County*, 8 F.4th 187, 193-94 (3d Cir. 2021)). For a pretrial detainee to state an excessive force claim, he must allege plausibly that "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396-97. The following circumstances "may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 397.

As to Defendant Bolden, the Court previously dismissed Anderson's claims related to her spitting on him because he had not sufficiently alleged that she "purposely or knowingly" used force against him in a way that "was objectively unreasonable." *Anderson*, 2026 WL 1079849, at *7 (quoting *Kingsley*, 576 U.S. at 396-97). Given the additional details in Anderson's factual

allegations in the Amended Complaint concerning the circumstances of Bolden's acts, the Court concludes that Anderson has stated a claim to relief, and the claim will proceed. As to Defendant Foster, Jr., Anderson alleges that Foster punched him in the face repeatedly while he was handcuffed, caused his head to hit a wall and doorframe, and knocked him to the ground, which led to injuries to his head and jaw that required emergency medical attention. (*See* Am. Compl. at 16-17.) These allegations state a claim to relief and will proceed.

As to Defendants Mendez and Doe 1, Anderson alleges that they were following Foster at a distance of about three feet and then held open the door to the medical area where Foster assaulted him, but they "just watched [the] assault." (Am. Compl. at 16.) In the context of an arrestee, "a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). The Supreme Court has held that there is no material difference in the analysis of excessive force claims for arrestees under the Fourth Amendment and pretrial detainees under the Fourteenth Amendment. *See Lombardo v. City of St. Louis*, 594 U.S. 464, 466 n.2 (2021); *see also Jacobs v. Cumberland County*, 8 F.4th 187, 195 n.6 (3d Cir. 2021) (noting the standards are "almost identical"); *see also Smith*, 293 F.3d at 650 (applying same standard to prison officials). Because "[t]he law does not allow either [police officers or corrections officers] to condone or cover up the use of excessive force," the relevant question is whether Mendez "ignored a realistic opportunity to intervene" in Foster's assault. *Smith*, 293 F.3d at 651-52. The Court concludes that Anderson has sufficiently stated a claim against Defendants Mendez and Doe 1.

Anderson also lodges a claim of excessive force against C.O. Goode for pepper spraying him "without warning" on July 24, 2025. (Am. Compl. at 20, 36.) Anderson alleges that he was seated near the medication area and refused Goode's directive to return to his cell, then she

pepper sprayed him without warning and claimed that he had threatened to spit on her. (*Id.* at 20.) Accepting Anderson's allegations as true, the Court concludes that Anderson has stated a claim to relief as to C.O. Goode. *See Drummond v. Angelucci*, No. 23-4767, 2024 WL 2136284, at *8 (E.D. Pa. May 10, 2024) (permitting excessive force claim to proceed past screening where pretrial detainee alleged he was "needlessly sprayed [ ] in the face with pepper spray when he requested to speak to a superior officer"); *Baker v. Crookus*, No. 21-4615, 2021 WL 5711830, at *3 (E.D. Pa. Dec. 1, 2021) (permitting excessive force claim to proceed past screening where plaintiff alleged correctional officer's use of pepper spray was "wholly unprompted and that lesser measures may have been appropriate").

**2. Deliberate Indifference to Medical Needs**

Anderson asserts numerous claims for deliberate indifference to his medical needs. As a pretrial detainee, the Fourteenth Amendment governs his claims. *See Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005). The standard for claims related to a prisoner's medical needs is essentially the same under either the Eighth Amendment or Fourteenth Amendment for purposes of the analysis. *See Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019) (citing *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003)); *Parkell v. Morgan*, 682 F. App'x 155, 159-60 (3d Cir. 2017) (*per curiam*).

**a. Claims Related to Diet**

The bulk of Anderson's deliberate indifference claims relate to the provision of a "soft food" diet that he asserts was prescribed from him by an outside doctor after the surgery on his jaw. Deliberate indifference to medical needs "can include deprivation of medically appropriate meals." *Walker v. Hensley,* No. 08-0685, 2009 WL 5064357, at *10 (E.D. Pa. Dec. 23, 2009) (first citing *Robles v. Coughlin,* 725 F.2d 12, 16 (2d Cir. 1983); then citing *Laufgas v. Speziale,*

No. 04-1697, 2006 WL 2528009, at *5 (D.N.J. Aug. 31, 2006)). "Whether an inmate has a legitimate, medically prescribed diet is a question wholly within the province of the prison administration." *Laufgas*, 2006 WL 2528009, at *5 (citation omitted). "There is a cognizable claim under § 1983 when prison officials are aware of the detainee's need for a special diet," but fail to provide it. *Jones v. Artis*, No. 13-5734, 2015 WL 3622695, at *3 (D.N.J. June 10, 2015) (cleaned up) (first quoting *Laufgas*, 2006 WL 2528009, at *5; then citing *Walker*, 2009 WL 5064357, at *10). Anderson was also "entitled to a nutritionally adequate diet." *Tapp v. Proto*, 718 F. Supp. 2d 598, 621 (E.D. Pa. 2010), *aff'd*, 404 F. App'x 563 (3d Cir. 2010); *see generally Duran v. Merline*, 923 F. Supp. 2d 702, 719-722 (D.N.J. 2013) (discussing claims of nutritionally inadequate diet in the context of pretrial detainees).

Anderson alleges that C.O. Jones was the "kitchen officer" at Riverside and was responsible for "special diets and meal delivery," and failed to provide his prescribed diet "on many occasion[s]" while he was housed in protective custody in April and May 2025. (Am. Compl. at 18.) He alleges that he complained about missing or damaged items to Defendants Polliver, Rogers, Johnson, and Allen, but the problems persisted. (*Id.*) He asserts that between August and October 2025, his diet was inexplicably changed, and he was not able to get "documentation" for the change despite his requests to kitchen staff. (*Id.* at 21.) At that time, he alleges that Sgt. Rivera-Robinson specifically interfered with his ability to receive his medically appropriate diet. (*Id.*) He explains that there was a discrepancy between the "soft diet" prescribed by the outside doctor and the "soft snack diet" ordered by Dr. Sobers and intermittently provided to him, which the Court understands Anderson to allege was nutritionally inadequate. (*Id.* at 22-23.) He alleges that while he was in the RHU in December 2025, Defendants Hawkins, Brapham, and Watson were responsible for delivering his meals and

denied him his prescribed diet. (*Id.* at 27.) The Court will allow Anderson's claims against Defendants Jones, Polliver, Rogers, Johnson, Allen, Rivera-Robinson, Sobers, Hawkins, Brapham, and Watson related to the provision of a medically necessary and nutritionally adequate diet to proceed to service.

However, Anderson names numerous Defendants and includes factual allegations related to his medical diet that do not state a claim to relief. His allegations against kitchen staff members Teesa, Littlejohn, Hill, and various Does do not state a claim to relief because his allegations do not support an inference that they were specifically aware of his need for a medical diet and denied it. His allegations also do not support the involvement of Nurse Brown, Lieutenant Conn, Captain Collins, C.O. Smith, C.O. Lewis, Sergeant Louise, C.O. Ross, C.O. Brown, or Dr. Jane Doe in the deprivation of his diet, because his only allegations against these Defendants are conclusory or suggest that they attempted to assist him. And, as explained in the Court's prior memorandum, he cannot state diet-related claims against Defendants Kilson, McKenzie, Wilson, and Deputy Warden J.S.—or any other unidentified Defendant—based solely on their involvement in the grievance process. *See Anderson*, 2026 WL 1079849, at *8 (citing *Curtis v. Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (*per curiam*)).

**b. Mental Health Treatment**

Anderson brings claims against the Jane Doe mental health doctor who interviewed him and gave him a choice between involuntary commitment to the mental health wing or taking Risperdal after he told her that he was hearing voices. (*See* Am. Compl. at 32, 40.) He further claims that the doctor violated his right to medical privacy when he allowed the correctional officers present at his mental health screening to hear and comment on their discussion. (*See id.*)

"[A] n individual has a constitutionally protected liberty 'interest in avoiding involuntary administration of antipsychotic drugs'—an interest that only an 'essential' or 'overriding' state interest might overcome." *Sell v. United States*, 539 U.S. 166, 178-79 (2003) (quoting *Riggins v. Nevada*, 504 U.S. 127, 134 (1992)). "[A] prison may compel a prisoner to accept treatment when prison officials, in the exercise of professional judgment, deem it necessary to carry out valid medical or penological objectives." *Aruanno v. Glazman*, 316 F. App'x 194, 195 (3d Cir. 2009) (quoting *White v. Napoleon,* 897 F.2d 103, 113 (3d Cir. 1990)). Due process is satisfied where there is a determination that "treatment with antipsychotic medication [is] medically appropriate and, considering less intrusive alternatives, essential for the sake of [a detainee]'s own safety or the safety of others." *Sell*, 539 U.S. at 179 (quoting *Riggins*, 504 U.S. at 135). "[T]he decision of a medical professional to force medicate a prisoner is presumed valid, 'unless it is shown to be such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment.'" *Aruanno*, 316 F. App'x, at 195 (quoting *White,* 897 F.2d at 113). Also, prisoners "retain a Fourteenth Amendment substantive due process right to privacy in their medical information." *Webb v. Dep't of Justice*, 117 F.4th 560, 569 n.13 (3d Cir. 2024) (quoting *Doe v. Delie*, 257 F.3d 309, 316 (3d Cir. 2001)). However, not all disclosures of medical information will violate a prisoner's right to privacy in his medical information if the disclosure is reasonably related to a legitimate penological interest. *Delie*, 257 F.3d at 317 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

Anderson alleges that he voluntarily signed up for an "emergency mental health" referral, told the doctor at screening that he was hearing voices, and then was forced to choose between commitment or medication, while C.O.s were present. (Am. Compl. at 31-32.) He states that the

doctor wanted him to take Risperdal, and he told her that he was willing to take a different medication, loxapine, which he had previously been prescribed,[2] but that "he felt fine and just was upset and needed to speak to mental health." (*Id.* at 32.) After a discussion for which corrections officers were present, Anderson "reluctantly signed" the authorization to take Risperdal. (*Id.*)

The Court concludes that Anderson's allegations do not state a claim to relief. First, taking his own allegations as true, he voluntarily sought out emergency mental health treatment, then was given a choice between two alternative treatments, and chose to accept medication rather than commitment to the mental health wing. Second, Anderson's factual allegations reflect only the exercise of the doctor's professional medical judgment and reasonable safety measures, not an attempt to forcibly medicate him for improper purposes. Accordingly, this claim will be dismissed.

**c. Claims Related to Other Medical Treatment**

Anderson also brings claims related to the treatment of the injury to his jaw, specifically, the failure to provide him with a medically prescribed mouthwash and wax for the screws in his mouth, and the lack of care for his complaints that he had a bone protruding from his gums, which led to an abscess and infection that required emergency treatment. (*See* Am. Compl. at 19, 35.) The Court concludes that Anderson states valid claims to relief based on his allegations that C.O. Allen and Nurse Brown ignored his requests for the prescribed mouthwash and his sick call slips, and that Dr. John Doe diagnosed his problem but then failed to provide antibiotics and

[2] Risperdal, generically known as risperdone, and loxapine are both antipsychotic medications used to treat schizophrenia, among other uses. *See* Natl'l Libr. of Med., *Risperdone*, https://medlineplus.gov/druginfo/meds/a694015.html; *Loxapine*, https://medlineplus.gov/druginfo/meds/a682311.html (both last visited August 10, 2026).

pain medication and delayed his referral to the dentist. *See, e.g.*, *Durham v. Kelley*, 82 F.4th 217, 230 (3d Cir. 2023) ("[P]rison officials may not 'deny reasonable requests for medical treatment . . . when such denial exposes the inmate to undue suffering or the threat of tangible residual injury.'" (citation omitted)).

However, Anderson's allegation that Nurse Gonzalez misdiagnosed the visible bone in his mouth as a sore tooth, before he received a second opinion, at most amounts to negligence and therefore fails to state a claim to relief. *See Montanez v. Price*, 154 F.4th 127, 141 (3d Cir. 2025) ("Mere negligence, . . . even if it constitutes medical malpractice[,] falls short of deliberate indifference. So does mere disagreement between the prisoner and medical personnel over the proper course of treatment."). Anderson also does not state a claim as to the nurse who denied him pain medication after she treated his mouth ulcer. *See, e.g.*, *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) ("[I]t is well established that as long as a physician exercises professional judgment [her] behavior will not violate a prisoner's constitutional rights." (citation omitted)). Nor does he state a claim based on his disagreement with the treatment he received from Dr. Sobers and various Does after his December 13, 2025 fight with Luis Martinez. *See Montanez*, 154 F.4th at 141. And he fails to state a claim based on his allegation that C.O. Allen-Wint "refused to call [a] stretcher" after his "blackout," because he does not plead that this resulted in any delay in treatment, since the "emergency staff responded" and he was then treated with a muscle relaxer and neck brace. (Am. Compl. at 24.)

**3. Failure to Protect from Inmate Violence**

Anderson alleges that at various times he asked to be placed in protective custody because he feared for his life and safety, but his requests were denied. He alleges that officers endangered his safety by threatening and harassing him in front of other inmates. And he alleges

that he was attacked by two specific inmates. Detainees have "a Fourteenth Amendment right to 'security from physical assault by fellow prisoners.' Thus prisons have a duty to protect inmates from other inmates' violence." *Hightower v. City of Philadelphia*, 130 F.4th 352, 356 (3d Cir. 2025) (first quoting *Davidson v. O'Lone*, 752 F.2d 817, 821 (3d Cir. 1984); then citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). "A prison violates that duty if it (1) creates conditions that pose a substantial risk of serious harm and (2) is deliberately indifferent to inmate health or safety." *Id.* (cleaned up) (quoting *Farmer*, 511 U.S. at 834). The Court previously noted that, in accordance with the weight of authority, such claims are best analyzed under an objective standard. *See Anderson*, 2026 WL 1079849, at *8 n.6 (citations omitted).

However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. A prison official demonstrates deliberate indifference to the risk of inmate-on-inmate violence if, before an attack, the official knows an inmate faces "an excessive risk of harm" from another prisoner but does nothing to prevent the assault. *Bistrian v. Levi*, 696 F.3d 352, 369 (3d Cir. 2012), *abrogated on other grounds as recognized in Hightower*, 130 F.4th at 357. Deliberate indifference may also exist if, when an attack occurs, an official has "a realistic and reasonable opportunity to intervene" but "simply refuse[s] to do so." *Id.* at 371 (quoting *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002)).

**a. Protective Custody**

The Court dismissed the failure-to-protect claims in Anderson's original Complaint largely because he only made vague references to fear based on his unspecified criminal charges and conclusory statements about his requests for protection. *See Anderson*, 2026 WL 1079849, at *9. The Court now understands Anderson to allege that because he was charged with crimes

related to the sexual abuse of a minor, and because of events he witnessed involving attacks on other inmates, he had a fear of harm from other inmates that he communicated directly to C.O. Leca, C.O. Howard, Lieutenant Flippen, and Lieutenant Radtke and requested they place him in protective custody, but his requests were denied. (See Am. Compl. at 24-25, 37-38.) These claims are sufficient to proceed.

Anderson does not plausibly allege the involvement of C.O. Watkins in his failure-to-protect claims, nor does he allege that any specific Defendant had a realistic opportunity to intervene in the actual assaults he suffered at the time they occurred and failed to do so. Anderson states in conclusory fashion that Sgt. Abrahms and Lt. Bishop "did not allow protective custody" but includes no facts to support that allegation, (*see id.* at 28), and so fails to state a claim to relief against them for failure to protect. Similarly, he asserts that Captain Prifti "failed to protect [him] from inmate assault on [two] occasions," (*see id.* at 38), but his only factual allegations as to Captain Prifti are about Prifti's conducting his misconduct proceedings on December 1 and 15, 2025, discussed below. These claims will be dismissed.

**b. Verbal Threats and Harassment**

Anderson also asserts that Defendants Pierce, Howard, Glenn, Allen-Wint, Flippen, and Coleman verbally abused or him in front of other inmates about his criminal charges or "conspired" to do so such that it exposed him to dangerous conditions from other inmates. (*See id.* at 37, 40.) Anderson makes specific allegations that, in front of other inmates, Pierce openly discussed his criminal charges, called him a rapist and a pedophile, and said that someone was "gonna kill" him. (*Id.* at 23.) He alleges that Howard called him a snitch in front of other inmates, and also made sexually harassing comments on two occasions, during one of which Howard rested his hand on Anderson's buttocks and threatened to sexually assault him. (*Id.* at

25.) Anderson then was in fact involved in an altercation with another inmate, Devin Torres, who called him a snitch and a rat, and then another altercation with cellmate Luis Martinez "because of [Anderson's] sex offense." (*Id.* at 26, 29.) He also alleges that Glenn called him a rapist and threatened to get someone to rape him. (*Id.* at 32.) The Court concludes that these allegations state a claim to relief. *See Dongarra v. Smith*, 27 F.4th 174, 179 (3d Cir. 2022) ("It is obvious that branding Dongarra a sex offender could make him a target of prison violence."); *see also Hullum v. Adams*, 827 F. Supp. 3d 220, 226 (D. Mass. 2026) (collecting cases concerning "the physical dangers posed by a prison official labeling an inmate a 'snitch,' 'sex offender,' or similar derogatory terms" and citing, *inter alia*, *Dongarra*, 27 F.4th at 179); *Sanchez v. Nassau County*, 662 F. Supp. 3d 369, 406-411 (E.D.N.Y. 2023) (denying summary judgment on defendant corrections officer's claim of qualified immunity from failure-to-protect claim that he identified pretrial detainee as a snitch prior to his assault); *cf. E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (explaining that a pretrial detainee has a Fourteenth Amendment right to "not be sexually assaulted by a state employee while in confinement" (citation omitted)).

His allegation against Allen-Wint is a conclusory statement that she expressed "dislike" for him for personal reasons, so he fails to state a claim to relief against her. (Am. Compl. at 24). And his allegations about Flippen and Coleman are conclusory or, at best, raise their involvement in recording the incident after the fact. (*See, e.g.*, *id.* at 32.) Accordingly, Anderson's claims against them will be denied in this respect, although his claims against Lieutenant Flippen related to the denial of his requests for protective custody will proceed for the reasons discussed above.

**5. Access to Courts and Attorney**

In dismissing Anderson's original Complaint, the Court concluded that any claims related to his access to the courts or communication with his attorney was not sufficiently well pleaded because "his factual detail is limited and confusing." *See Anderson*, 2026 WL 1079849, at *10-11. Anderson now makes more detailed factual allegations that he was "sworn in *pro se*" in his criminal case on April 1, 2025, that he was appointed two standby attorneys to advise him who were not public defenders, and that he was "ultimately . . . denied [his] right to proceed *pro se*." (Am. Compl. at 20, 26, 28.) He alleges that he was both denied access to the law library and unable to use the phone to contact his standby counsel because their contact information was among the legal materials confiscated from him, and the phone was only available to contact the public defenders' office. (*Id.* at 28.) Anderson also makes allegations concerning the curtailment of his access to the law library when he was seeking to prepare arguments for his sentencing. (*Id.* at 29-30.) Anderson was housed in the RHU in the days leading up to his December 2025 trial, and then again after his trial for another month, when he suffered these alleged deprivations.

The docket in Anderson's criminal case contains an entry of appearance on his behalf on April 1, 2025, by John A. Marroletti, another on September 4, 2025, by Jules Norris Szanto, and then a third during his direct appeal proceedings on March 18, 2026, by Geroge Yacoubian. *See Anderson*, No. CP-51-CR-0000016-2025. The docket also does not contain any mention of a *Grazier* hearing[3] to determine Anderson's ability to proceed *pro se* until after his sentencing, when his appeal to the Pennsylvania Superior Court included an order on May 19, 2026,

---

[3] *See Commonwealth v. Grazier*, 713 A.2d 81, 82 (1998).

remanding to the trial court to conduct such a hearing after Attorney Yacoubian moved to withdraw. *See id.*; *see also Commonwealth v. Anderson*, 525 EDA 2026 (Pa. Super. Ct.)

"Under the Sixth Amendment, a pretrial detainee has a right to utilize counsel to defend against a criminal case that the state has brought against him." *Prater v. City of Philadelphia*, No. 11-1618, 2015 WL 3456659, at *4 (E.D. Pa. June 1, 2015) (on remand) (citing *Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001)). With respect to restrictions on attorney contact with clients, "the Supreme Court has held that inmates must have a reasonable opportunity to seek and receive the assistance of attorneys and that prison regulations and practices that unjustifiably obstruct the availability of professional representation are invalid." *Benjamin*, 264 F.3d at 184 (cleaned up) (quoting *Procunier v. Martinez*, 416 U.S. 396, 419 (1974)). Thus, where an institutional restriction impedes a pretrial detainee's access to criminal counsel, "the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 187 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). A prison regulation restricting a pretrial detainee's contact with his attorney will be unconstitutional where it "unreasonably burden[s] the inmate's opportunity to consult with his attorney and to prepare his defense." *Id.* (quoting *Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978)).

A claim of unreasonable interference with Sixth Amendment right to counsel does not require a showing of actual injury. *See Benjamin*, 264 F.3d at 185 (pretrial detainee has standing to assert unreasonable interference with Sixth Amendment right even if the interference did not result in "actual injury"). Although the Third Circuit has not ruled on this issue in a published opinion, the court in *Prater* noted that district court had failed to address prisoner's Sixth Amendment interference with right to counsel claim and disagreed with district court's implicit conclusion that the claim required a showing of actual injury. *Prater*, 542 F. App'x at 139, n.5

(affirming in part on alternate basis) (citing *Benjamin*, 264 F.3d at 185). Generally speaking, a pretrial detainee's right to access the courts to defend against pending criminal charges is satisfied by providing access to either a law library or the assistance of counsel. *See, e.g.*, *Diaz v. Holder*, 532 F. App'x 61, 63 (3d Cir. 2013) (*per curiam*) (first citing *Bounds v. Smith,* 430 U.S. 817, 831 (1977); then citing *Peterkin v. Jeffes,* 855 F.2d 1021, 1042 (3d Cir.1988); and then citing *Degrate v. Godwin,* 84 F.3d 768, 768-69 (5th Cir.1996)).

Taking Anderson's allegations as true, the Court concludes that, because he alleges that he was denied *both* access to the law library *and* access to his court-appointed counsel, he has stated a claim to relief. Specifically, he alleges the personal involvement of Defendants Coley, McManus, Kilson, Abrahms, Bishop, and Brapham in these claims, and they will proceed. However, he does not state a claim for deprivation of his access to the law library by Defendants Thomas, Cook, and Smith during his time in the PHSW in March 2025, because that occurred before he alleges that he was "sworn in *pro se*" in his criminal case.[4]

[4] As noted above and in the Court's prior Memorandum, Anderson commenced a separate civil action through counsel in state court in July 2025, concerning another, earlier assault on him in CFCF; that case was later removed by the Defendants to this Court and remains pending. *See Anderson v. City of Philadelphia*, No. 26-0037 (E.D. Pa.). Although he does not directly reference that case or any other civil cases in the Amended Complaint, to the extent that his claims about access to the courts or his lawyer concern civil claims stemming from purported injuries he sustained while in detention or other conditions of confinement—as opposed to his criminal proceedings—such claims fall outside the scope of his Sixth Amendment right to counsel. "Under the First and Fourteenth Amendments, prisoners [and pretrial detainees] retain a right of access to the courts." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008). "A prisoner making an access-to-the-courts claim [under the First and Fourteenth Amendments] is required to show that the denial of access caused actual injury," *Jackson v. Whalen*, 568 F. App'x 85, 87 (3d Cir. 2014) (*per curiam*) (quoting *Lewis v. Casey*, 518 U.S. 343, 350 (1996)), and that the injury is traceable to the conditions of which he complains, s*ee Diaz v. Holder*, 532 F. App'x 61, 63 (3d Cir. 2013) (*per curiam*) (affirming dismissal of denial of access claims where plaintiff failed to tie alleged deficiencies in library to harm in underlying action). So, such access-to-courts claims arise "in two types of cases, challenges (direct or collateral) to . . . sentences and conditions of confinement." *Monroe*, 536 F.3d at 205; *Shane v. Fauver*, 209 F. App'x 87, 89 (3d Cir. 2006) (*per curiam*) ("[T]he actual injury requirement is not met by every

### 6. Misconduct Reports and Misconduct Proceedings

Anderson lodges claims against numerous Defendants related to his misconduct proceedings that were based on purportedly false misconduct reports. "Generally, prisons may sanction a pretrial detainee for misconduct that he commits while awaiting trial, as long as it is not a punishment for the 'underlying crime of which he stands accused.'" *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018) (quoting *Rapier v. Harris*, 172 F.3d 999, 1003-06 (7th Cir. 1999)). "[T]he imposition of disciplinary segregation [on pretrial detainees] for violation of prison rules and regulations cannot be imposed without providing the due process protections set forth in *Wolff v. McDonnell*, 418 U.S. 539 (1974)." *Kanu*, 739 F. App'x at 116. Such protections "include the right to receive written notice of the charges at least 24 hours before the hearing, the opportunity to present witnesses and documentary evidence, and a written statement of the reasons for the disciplinary action taken and the supporting evidence." *Id.* (citing *Wolff*, 418 U.S. at 563-66); *see also Stevenson v. Carroll,* 495 F.3d 62, 70 (3d Cir. 2007). "[T]he filing of a fraudulent misconduct report and related disciplinary sanctions do not without more violate due process," *Seville v. Martinez*, 130 F. App'x 549, 551 (3d Cir. 2005) (*per curiam*), and "[d]ue process is satisfied where an inmate is afforded an opportunity to be heard and to defend against

type of frustrated legal claim; constitutional protections are applied only to a prisoner's direct or collateral attack on his or her sentence, or challenges to prison conditions"). In general, an actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). "[T]he underlying cause of action, . . . is an element that must be described in the complaint." *Id*. Furthermore, the right to access the courts may be satisfied if the plaintiff has an attorney. *Diaz*, 532 F. App'x at 63 (citing *Bounds v. Smith*, 430 U.S. 817, 831 (1977) and *Peterkin v. Jeffes*, 855 F.2d 1021, 1042 (3d Cir. 1988)); *see also Prater v. City of Philadelphia*, 542 F. App'x 135, 137 n.4 (3d Cir. 2013) (*per curiam*). Anderson does not describe any civil claim that he was unable to bring, and he is represented by counsel in case number 26-0037 in this Court. So, as was true of his original Complaint, Anderson fails to describe any actual injury resulting from alleged interference with his ability to bring a civil case, so he has failed to state a claim.

the allegedly false misconduct reports," *Thomas v. McCoy*, 467 F. App'x 94, 97 (3d Cir. 2012) (*per curiam*); *see also Smith*, 293 F.3d at 654 ("[S]o long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim.").

Anderson alleges that Captain Prifti conducted both of his misconduct hearings. Anderson makes no allegations of procedural improprieties at the December 1, 2025 hearing. (*See* Am. Compl. at 8.) At the second hearing, on December 15, 2025, Prifti denied Anderson the opportunity to present a witness from the neighboring cell who heard the entire altercation between Anderson and his cellmate Luis Martinez. (*Id.* at 29.) The Court understands Anderson to assert that the witness could have been able to rebut C.O. Austin's alleged fabrication in the misconduct report that Anderson attacked Martinez while he was sleeping. (*See id.*) Prifti found Anderson guilty of misconduct and told Anderson he had also found Martinez not guilty. (*Id.*) Given the allegation that Austin fabricated the misconduct report and Prifti denied Anderson the opportunity to call a rebuttal witness, thus denying him the opportunity to be heard, the Court will allow the due process claims against these two Defendants to proceed. All other claims related to misconduct reports or proceedings will be dismissed.

**7. SHOWERS AND RECREATION**.

Anderson alleges that at times when he was in the PHSW, protective custody, or the RHU, he was occasionally denied showers or recreation. The denial of showers and exercise for short periods does not constitute the type of serious deprivation that amounts to a constitutional violation. *See, e.g., Fortune v. Hamberger*, 379 F. App'x 116, 122 (3d Cir. 2010) ("Fortune complained of his inability to adequately shower and exercise for a period of fifteen days. Although it is not clear how many times Fortune believes that he should have been permitted to

engage in those activities in addition to the time he was already given to do so, he does not allege that he suffered any harm as a result of the denial of additional showers and exercise."); *Coleman v. Hodges*, No. 18-1152, 2018 WL 6618459, at *8 (W.D. Pa. Nov. 30, 2018), *report and recommendation adopted*, 2018 WL 6618408 (W.D. Pa. Dec. 18, 2018) ("[B]eing denied a shower for four days does not constitute a serious enough deprivation of sufficient duration to establish a constitutional violation") (citing cases); *Barndt v. Wenerowicz*, No. 15-2729, 2016 WL 6612441, at *4 (E.D. Pa. Nov. 8, 2016), *aff'd,* 698 F. App'x 673 (3d Cir. 2017) (denial of showers and out of cell exercise for twenty-eight days did not violate Eighth Amendment when plaintiff did not suffer ill effects and had access to running water in his cell); *Barnes v. County of Monroe*, 85 F. Supp. 3d 696, 738 (W.D.N.Y. 2015) ("To the extent Plaintiff alleges that his inability to shower over the course of four days constitutes a constitutional deprivation, his claim must fail. Even a two-week suspension of shower privileges does not constitute a denial of 'basic hygienic needs.'" (quoting *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003)).

The United States Court of Appeals for the Third Circuit also has acknowledged that when considering whether a deprivation of outdoor exercise amounts to a substantial deprivation, courts should consider the totality of the circumstances, including, but not limited to, the length of the deprivation, the availability of recreation within the cell, and whether the inmate suffered any ill health effects as a result of the deprivation. *Barndt*, 698 F. App'x at 677 (citing *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992); *Rodgers v. Jabe*, 43 F.3d 1082, 1086 (6th Cir. 1995); *Patterson v. Mintzes*, 717 F.2d 284, 289 (6th Cir. 1983)).

Anderson's allegations of occasional deprivations of recreation and showers, with no connection to any resulting harm, fail to state a claim to relief.

**8. Retaliation**

Finally, Anderson repeatedly alleges that, since he filed voluminous grievances based on the Defendants' conduct, any and all of their actions constitute retaliation for protected conduct. (*See generally* Am. Compl. at 34-40.) "Absent supporting facts that make it reasonable to draw an inference of retaliation, . . . conclusory assertions of a cause-and-effect relationship between specific protected activities and a later adverse action are insufficient to plead causation." *Oliver v. Roquet*, 858 F.3d 180, 195 (3d Cir. 2017) (citations omitted); *see also Wallace v. Pa. Dep't of Corr.*, No. 24-152, 2025 WL 1568665, at *7 (W.D. Pa. June 3, 2025) ("Where every defendants' action can obviously be explained without supposition of a retaliatory motive, some concrete basis for retaliation must be alleged to state a plausible claim. . . . Wallace makes a classic circular argument: there must have been a retaliatory motive behind any actions by the defendants because a retaliatory motive would explain any actions by the defendants. Using the word 'retaliation' or some form thereof does not allege retaliation."). The Court concludes that Anderson's boilerplate, conclusory repetition that the Defendants retaliated against him for protected conduct because he is a prolific filer of grievances fails to state a claim to relief.

**9. Official Capacity Claims**

Anderson alleges that he is suing all Defendants in their official and individual capacities. Claims against City officials named in their official capacity are indistinguishable from claims against the City. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55

(1978)). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.*

To state a claim for municipal liability, a plaintiff must allege that the defendant's policies or customs caused the alleged constitutional violation. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003). The plaintiff "must identify [the] custom or policy, and specify what exactly that custom or policy was" to satisfy the pleading standard. *McTernan v. City of York,* 564 F.3d 636, 658 (3d Cir. 2009). "It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim." *See Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (citing *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (if a municipal employee "inflicted no constitutional injury . . ., it is inconceivable that [the municipality] could be liable")).

For the claims determined not to be plausible, any associated *Monell* is also not plausible. Among the claims that the Court has determined above will proceed to service, none appear to be based on the enforcement of a policy or custom. Accordingly, his official capacity claims against the Defendants are not plausible and will be dismissed without prejudice. The Court will entertain a future request by Anderson to amend his pleading to reassert an official capacity claim/*Monell* claim against the City of Philadelphia, should he be able to cure this defect, but will not delay service of process at this time.[5]

---

[5] Anderson's passing references to various other incidents, such as being given trash bags to cover his mattress one night and a single purportedly unauthorized withdrawal from his inmate account, are insufficient to bring a plausible claim before the Court. *See Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 763 (3d Cir. 2023) ("A passing reference to an issue will not suffice to bring that issue before this court.") (cleaned up) (quoting *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994)).

## IV. CONCLUSION

For the foregoing reasons, the following claims will proceed:

- Excessive force by Bolden and Foster, and failure to intervene by Mendez and C.O. John Doe 1;
- Deliberate indifference to medical needs related to the provision of a medically necessary and nutritionally adequate diet against Jones, Polliver, Rogers, Johnson, Allen, Rivera-Robinson, Sobers, Hawkins, Brapham, and Watson;
- Deliberate indifference to medical needs based on lack of after-care for mouth wounds against Allen, Nurse Brown, and Dr. John Doe (identified in Am. Compl. at 10, 19, 35);
- Failure to protect from inmate violence related to the denial of protective custody by Leca, Howard, Flippen, and Radtke;
- Deliberate indifference to safety through verbal threats and harassment by Pierce, Howard, and Glenn;
- Denial of access to courts and counsel by Coley, McManus, Kilson, Abrahms, Bishop, and Brapham; and
- Due process violations related to misconduct proceedings by Prifti and Austin.

The remainder of the claims in Anderson's Amended Complaint are dismissed on statutory screening pursuant to 28 U.S.C. § 1915 for failure to state a claim. Anderson is not granted leave to amend at this time, and the case will proceed to service. An appropriate order follows.[6]

[6] Anderson's Motions to Appoint Counsel (ECF Nos. 4 and 13) will be denied without prejudice to renewal after service is complete and the Defendants have filed responsive pleadings.